

terpretations of the facts found by the physicians. Such administrative findings can have no probative effect upon the issue in the law case. Equitable Life Assur. Soc. v. Stinnett, 13 F.(2d) 820 (6 C. C. A.). There is nothing in McInerney v. United States (C. C. A.) 143 F. 729, and Evanston v. Gunn, 99 U. S. 660, 25 L. Ed. 306, which conflicts with this view. McGovern v. United States (D. C.) 294 F. 108, was based upon these two decisions and we think not only misconceives their meaning, but fails to take account of the rule that an official record is evidence only of what it purports to show, and, where the fact shown has no probative value or bearing on the issue, like other impertinent facts it is inadmissible.

The other errors assigned relate to the admission and rejection of parts of the testimony of an expert medical witness, and to the duty of the jury to find in favor of the plaintiff. With respect to the testimony of the expert, it is sufficient to say that we find no error in the rulings of the court. The other question is one of fact on which there was a conflict of evidence, and it ought not to be necessary to say that it is not the province of this court to determine the weight of the evidence as between conflicting theories.

The judgment is affirmed.

### HOPE FOUNDRY & MACHINE CO., Inc., v. BONNELL.

### No. 6.

Circuit Court of Appeals, Second Circuit.

Oct. 19, 1931.

The statement and opinion of District Judge Thacher are as follows:

In Equity. Suit for infringement of patent No. 1,441,054 upon an outlet box for use in electrical wiring, issued to Joseph Barry, January 2, 1923, upon application filed October 12, 1920.

The patent specification discloses an outlet box circular in form through which the cables are drawn by means of apertures positioned in a wall extending partly across the front face of the ring which forms the circular side of the box. A rear wall extending partly across the rear face of the ring, and only over that portion not covered by the front wall, is furnished with screw holes by means of which it can be fastened to a supporting beam or joist in the wall or ceiling. The space within the ring beneath the front wall is divided from the space within the ring beneath the rear wall so that there are within the ring two open chambers, one opening inwardly toward the wall and the other outwardly toward the fixture; the former having holes in the front wall through which the wires are led into the fixture, and the latter having holes in the rear wall through which the screws are attached to the support. Positioned within the chamber through which the cables are received the specification discloses certain clamping devices for securing the cables. Upon this disclosure Barry originally presented four claims, as follows:

"1. An outlet box having a plurality of apertures in one face thereof adapted to receive cables therein, said apertures grouped substantially on one side of the face.

"2. An outlet box having on each face a flat wall and a recess, the wall on one face being disposed opposite the recess on the other face, one of said walls having a plurality of apertures therein adapted to re-

ceive cables, the other of said walls on the opposite face of the outlet box adapted to be clamped to a stud or joist.

"3. An outlet box having a recess portion and a plurality of apertures in the wall of said recess, said apertures adapted to receive cables, clamping means in said recess, said clamping means comprising a curved, stationary plate adjacent one side of each aperture and a curved, movable plate disposed adjacent the opposite side of each aperture, and adjustable means connecting said plates to grip a cable therebetween.

"4. An outlet box having a clamping face and a face with a plurality of apertures therein, said apertures grouped substantially on one side of the center of the box, the face containing the apertures being disposed on one side of the box and the clamping face being disposed on the opposite side of the box."

These claims were all rejected by the Examiner on reference to Nickerson 1,358,-774, November 16, 1920, and Greenfield 975,-032. In response to this ruling, Barry canceled claim 3 and requested that claim 4 be renumbered as 3, claiming that the claims thus remaining in the case were drawn specifically to the difference between the references and the applicant's structure. These claims were again rejected; claims 1 and 3 (originally 4) on Hublinger 950,176, Coffin 901,593, and Hublinger 911,989, and claim 2 on Hublinger 950,176 and Greenfield 975,-032. In response to this ruling, Barry canceled all of his claims and substituted the following:

"1. An outlet box which comprises a circular ringlike body portion, a wall extending partly across the front face of the ring, and a rear wall extending partly across the rear face of the ring to cover that portion of the rear face not covered by the front wall, one of said walls having a plurality of cable-receiving apertures disposed therein, the other of said walls having a plurality of apertures to receive screws or fastening means, each of said walls being flush with respect to the edges of the body portion.

"2. An outlet box which comprises a body portion having a flat wall and a recess on each face, the wall on one face being flush with the respective edge of the body portion and disposed opposite the recess on the other face, one of said walls having a plurality of cable-receiving apertures therein, the other of said walls on the opposite face of the box having apertures therein to receive fastening means."

These claims were allowed, and the patent issued with the substituted claims, both of which are here in suit.

### Opinion.

The proceedings in the Patent Office show that the claims of the patent in suit must be very narrowly read upon the specific structure disclosed in the specification. Rejection of all the original claims left nothing but the specific form devised by Barry for disposing in a recess on one side of the box all of his cable openings and in a recess on the other all of his openings for screws or other means of attaching the box to its support. Except for the oppositely positioned chambers, there was nothing novel in this method of attachment. It is disclosed in the Bonnell devices (Exhibits H and I) which are pictured in the Bonnell catalogue (Exhibit E) published in 1912. These are two and four hole loom boxes, respectively, adapted for use when the wires are carried in fabric or loom cases but not when the wires are carried in metal cases. In Hublinger 950,176 a grouping of cable openings on one side and of screw holes on the other side of an outlet box is shown, and in Greenfield 975,032 sockets in the back of the box for the reception of cables are disclosed. It was well said by the Patent Examiner in rejecting the original claims: "There can be no invention in forming cable-receiving sockets in the back of the Hublinger device, as suggested by Greenfield." By that is meant, I take it, by grouping together the bushings or sockets of Greenfield so as to position them on one side of the box and thus leave the other side to be secured to the support, as in Hublinger. I concur in this conclusion of the Examiner, and it may be added that it would not involve invention to substitute for the holes in the flat surfaces of the Bonnell loom devices bushings or sockets for the reception of armored cables. If this is all the defendant has done, the patent in suit, if valid, is not infringed.

In the defendant's alleged infringing device there are, on one side of the box, three sockets or bushings through which the cables are received. The unoccupied space has in its rear wall holes for the screws by means of which the box is attached to its support. The means for clamping the cables are old, and are the same as those disclosed by Greenfield and others. To bring the defendant's device verbally within the claims, it is

necessary to treat the metal surrounding the sockets as forming a wall extending partly across the front face of the ring (claim 1) and to treat one of the sockets as the recess in the rear face of the ring referred to in claim 2. This, I think, is stretching the claims beyond the specific structure disclosed in the specification—so far, indeed, as to include a structure which cannot be said to involve invention. When the claims are read with reference to the specification, it seems quite clear that the two partial rear and front walls were intended to form substantial recesses or chambers on either side of the outlet box, and that the claims were not intended to cover individual sockets or bushings, as in Greenfield, positioned in the back of an outlet box, as are the openings in Hublinger and in the Bonnell loom devices. If not so limited, I should feel constrained to hold them invalid for lack of invention. It follows that if there be invention to support this patent, its claims must be so narrowly read upon the specific structure disclosed that the structure here complained of cannot be said to infringe.

Result is that the complaint must be dismissed, with costs to the defendant.

George P. Kimmel, of Washington, D. C., and D. L. Morris, of New York City, for appellant.

Charles S. Jones, of Washington, D. C., Otto Munk, and T. J. Johnston, both of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

PER CURIAM.

Decree affirmed on opinion of Thacher, Judge, below.

**FIDELITY & DEPOSIT CO. OF MARYLAND v. MUIR.**

**No. 5698.**

Circuit Court of Appeals, Sixth Circuit.

Nov. 9, 1931.

HICKENLOOPER, Circuit Judge, dissenting.

L. T. Wolford, of Louisville, Ky. (Wm. Marshall Bullitt, R. Lee Blackwell, and Bruce & Bullitt, all of Louisville, Ky., on the brief), for appellant.

Ernest Fulton, of Bardstown, Ky. (David A. McCandless, of Louisville, Ky., and Fulton & Fulton and Will H. Fulton, all of Bardstown, Ky., on the brief), for appellee.

Before DENISON, HICKS, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

McClaskey, before the Prohibition Act, owned and operated a distillery in Kentucky, which was registered as No. 442 of the Kentucky district. In connection with it, he operated a warehouse, where he kept his manufactured liquor in bond, and of which stored liquor he had sold the most part by virtue of the issue and sale of warehouse certificates. Under such certificates he became the warehouseman of what he had sold, until it should be legally tax paid and withdrawn. After the National Prohibition Act, he continued for two or three years to make withdrawals, which he bottled and shipped under the necessary permits. In May, 1922, there remained in the warehouse only 14 barrels belonging to him, and of the remainder belonging to the warehouse receipt holders, 22 barrels belonged to a man named Ginnocchio. At this time McClaskey made with Morton the arrangements which give rise to this controversy. McClaskey's interpretation is that Morton bought him out and succeeded him in all the bottling and warehouse business which was then being done and which could be carried on; that it was necessary to do this in McClaskey's name because he had a permit and Morton could not get one; and that, accordingly, Morton was to have the use of McClaskey's name wherever necessary; but that McClaskey, in spite of the written contracts to the contrary, retained no actual interest in the business. In the contract between them, and after reciting the details of the arrange-